UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**UNITED STATES OF AMERICA,**            :

                                         :     Cr. No. 18-21(KM)

        v.                               :

**JESSE TULLIES,**                       :
                                               Hon. Kevin McNulty, U.S.D.J.
                                         :

                                         :

-------------------------------------------------------------------

**DEFENDANT BRIEF IN SUPPORT OF MOTION TO VACATE, SET-ASIDE OR CORRECT A SENTENCE PURSUANT TO 28 U.S.C. § 2255 AND APPENDIX (pp. 1-19)**

-------------------------------------------------------------------

**JOHN J. MCMAHON, ESQ.**
Attorney ID 038111989
80 Main Street, Suite 580
West Orange, N.J. 07052
973-761-2210-
jmc@jjmcmahonlaw.com

        *Of counsel and On the Brief*

Defendant Is Confined

**TABLE OF CONTENTS**

**PAGE NOS.**

PROCEDURAL AND FACTUAL BACKGROUND..............................1

I.    STANDARD OF REVIEW......................................7

II.   LEGAL ARGUMENT: PETITIONER TULLIES WAS DENIED THE
      EFFECTIVE ASSISTANCE OF COUNSEL IN THIS CASE..........10

      Ground 1:Defense Counsel Should Not Have Called
      Dina Blackwell As a Witness Because Her
      Testimony Was Devastating to Tullie's
      Defense..............................................11

      Ground 2:If The Calling Of Dina Blackwell As
      A Witness Did Not Render Counsel
      Ineffective, His Failure To Salvage
      Her Credibility By Calling The Investigator
      That He claimed Was With Her Resulted
      In Ineffective Assistance of
      Counsel..............................................22

      Ground 3:The Testimony Of FBI Agent John Havens, Jr.,
      Appearing As An Expert For the Government, Should Have
      Been Objected To And Deemed Inadmissible Because It
      Directly Commented On The Mens Rea Of The Defendants In
      Violation of F.R.E. 704(b)...........................25

      Ground 4:Defense Counsel's Erroneous View Of The Law And
      Trial Practice Resulted In His Ineffective Representation
      Of Defendant Tullies When He Failed To Use Defendant's
      Phone Records To Dispute The Claims Of The Law
      Enforcement Witnesses ...............................29

      Ground 5:Defense Counsel Failed To Request That Obvious
      Jencks Materials Be Provided To The
      Defense..............................................31

      Ground 6: The Cumulative Effect Of Counsel's Failures
      Establishes Prejudice................................34

III.  REQUEST FOR AN EVIDENTIARY HEARING.....................35

CONCLUSION.................................................36

i

TABLE OF AUTHORITIES

***CASES:***

*Brady v. Maryland*, 373 U.S. 83, 87 (1963) ............................................32

*Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) ...............................7

*Carpenter v. Vaughn,* 888 F. Supp. 635, 654 (M.D. Pa. 1994)

.............................................................................................................................23, 24

*Clay v. United States*, 537 U.S. 522, 525 (2003).............................2

*Edwards v. Vannoy*, 141 S.Ct. 1547 (2021).......................................2

*Giglio v. United States,* 405 U.S. 150, 154 (1972) .........................32

*Jencks v. United States*, 353 U.S. 657 (1957) ...............................32

*Kaufman v. United States,* 394 U.S. 217, 227 n.8 (1969).................8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)..................27

*Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995) .............................32

*Massaro v. United States,* 538 U.S. 500, 504 (2003) .......................8, 9

*Miller v. United States,* 261 F.2d 546, 547 (4th Cir. 1958)............7

*Sanders v. United States,* 373 U.S. 1, 19 (1963) ...........................35

*State v. Watson*, 260 F.3d 301, 308 (3d Cir. 2001) ..................28, 29

*Strickland v. Washington*, 466 U.S. 668, 687-88

(1984)...........................................................9, 10, 11, 20, 22, 25, 30, 31

*Wall v. Kholi,* 562 U.S. 545, 551-52 (2011) .................................8

*United States v. Basham,* 561 F.3d 302, 330 (4th Cir. 2009) .........34

*United States v. DeRewal,* 10 F.3d 100, 105 n.4 (3d Cir.

1993).......................................................................................................8, 9

*United States v. Frady*, 456 U.S. 152, 165 (1982) ............................8, 9

*United States v. Griffith*, 118 F. 3d 318, 321 (5th Cir. 1997)...27

*United States v. Martinez,* 277 F.3d 517, 532 (4th Cir. 2002)......35

*United States v. Mitchell*, 302 U.S. App. 153, 996 F.2d 419, 422 (D.C. Cir. 1993) ..........................................................................28

*United States v. Nahodil,* 36 F.3d 323, 326 (3d Cir. 1994)..............9

*United States v. Orejuela, 639 F.3d 1055, 1057 (3d Cir. 1981)*...8

*United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990)...35

*United States v. Robinson*, 562 Fed. Appx. 72 (3d Cir. 2014)......29

*United States v. Russell*, 34 Fed. Appx. 927, 928 (4th Cir. 2002 ..........................................................................................35

*United States v. Travillion,* 759 F.3d 281, 288 (3d Cir. 2014)..........................................................................................8

*United States v. Underwood*, 246 Fed. Appx. 92 (3d Cir. 2007) ...29

**STATUTES:**

18 U.S.C. § 922(g)(1) ..........................................................1

18 U.S.C. § 924(c)(1)(A) ......................................................1

18 U.S.C. § 3500..............................................32, 33, 24

21 U.S.C. § 846..................................................................1

21 U.S.C. § 846(a) ............................................................1

21 U.S.C. § 846(b)(1)(C) ...................................................................................................1

28 U.S.C. § 2255 ...................................................................................7, 8, 9, 10, 11, 35

28 U.S.C. § 2255(a) ...........................................................................................7, 22, 25, 31

28 U.S.C. § 2255(f)(1) ........................................................................................................1

**RULES:**

*Sup. Ct. R.* 13.3 .............................................................................................................2, 7

*F.R.E.* 702 ..........................................................................................................................27

*F.R.E.* 704 ..........................................................................................................................28

*F.R.E.* 704(b) ..............................................................................................................25, 27, 28

*F.R.E.* 803(6) ....................................................................................................................30

**OTHER AUTHORITIES:**

Black's Law Dictionary 298 (9th ed. 2009) ..............................................................8

## PROCEDURAL AND FACTUAL BACKGROUND

Jesse Tullies was convicted in the United States District Court for New Jersey, after a trial, of conspiracy to distribute heroin in violation of 21 U.S.C. § 846; distribution of heroin, in violation of 21 U.S.C. § § 841(a), (b)(1)(C); possession with intent to distribute crack, in violation of 21 U.S.C. § 841(b)(1)(C); possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).[1] *United States v. Jesse Tullies*, Criminal No. 2:18-cr-21-01 (KM). On August 19, 2019, defendant Tullies was sentenced to an aggregate term of 235 months.

On August 23, 2019, the defendant filed a timely Notice of Appeal with the clerk of the district court from the final order of judgment issued in this case. Mr. Tullies's convictions and sentence were affirmed by the United States Court of Appeals for the Third Circuit on February 10, 2022. *United States v. Tullies and United States v. Williams*, Nos. 19-2957 and 19-2976. No petition for *certiorari* was thereafter filed with the Supreme Court. This petition is timely in that it is filed within one year and 90 days of the affirmance by the Third Circuit. *See* 28 U.S.C. § 2255 (f)(1) (a "one year period of limitation shall apply to a

---

[1] Codefendant Eugene Williams was similarly charged and convicted.

1

motion under this section. The limitation period shall run from …
the date on which the judgment of conviction becomes final"); *see,
also, Edwards v. Vannoy,* 141 S.Ct. 1547 (2021) ("Everyone accepts
that, in our criminal justice system today, a judgment becomes
final only after the completion of a trial and the appellate
process, including the opportunity to seek certiorari from this
Court on questions of federal law"); *Clay v. United States*, 537
U.S. 522, 525 (2003) ("a judgment of conviction becomes final when
the time expires for filing a petition for certiorari contesting
the appellate court's affirmation of the conviction"); Sup. Ct. R.
13.3 (*certiorari* petition must be filed within 90 days after the
entry of the judgment).[2]

At trial Detective Yusef Ellis and his colleagues at the Essex
County Sheriff's Office testified that the two defendants were
observed selling heroin on Weequahic Avenue near Clinton Place in
Newark, New Jersey, to John Potts and an unidentified woman. Upon
arrest, law enforcement officers searched a car that was across
the street from the alleged drug sales and the officers found
heroin, crack cocaine and three loaded 9-millimeter handguns.

As the trial court noted in its opinion denying the joint
motions for a judgment of acquittal or in the alternative for a

---

[2] The due date for this petition to be timely is May 14, 2023.

new trial, the facts gleaned from the government's case were as
follows:

> The charges stemmed from the events of a
> single afternoon, October 4, 2017. An
> undercover officer saw the defendants engage
> in two sales of illegal narcotics. The
> officers apprehended one customer in
> possession of the heroin he had just
> purchased. They seized heroin and crack
> cocaine, as well as three loaded handguns,
> from a parked car that defendants used as a
> stash.

(Motion opinion p. 1)

Detective Ellis identified the defendants as two men who were
involved in the hand-to-hand narcotics transactions. He saw the
transactions while conducting surveillance from an unmarked car.
(Tr. 158) Det. Ellis testified that he saw a white male (later
identified as John Potts) pull up in a green Honda Civic and speak
with Tullies. (Tr. 159-60) Williams then crossed the street and
went to a Chevy Lumina parked at 249 Weequahic Avenue. (Tr. 161-
63) From the rear bumper of the Lumina, Williams retrieved a clear
plastic bag, removed some items and then returned the bag under
the car. (Tr. 164-65) Williams walked back across the street and
handed the items to Tullies. Ellis claimed that he could see that
the items were glassine folds, commonly used to package heroin.
(Tr. 166) Ellis testified that Tullies handed the items to the
driver of the Civic in return for cash. (Tr. 166-67)

3

A second transaction occurred when an unidentified woman approached Tullies on foot. (Tr. 170-71) According to Ellis, this time Tullies went to the Lumina just as Williams had done earlier. (Tr. 171) Tullies reached under the rear bumper of the car, pulled out a plastic bag, removed items from that bag and put it back under the bumper. (Tr. 172) Tullies crossed the street again and returned to the unidentified woman. (Tr. 173) Ellis said that he could see that Tullies had glassine folds in his hand, which he gave to the woman in return for cash. (Tr. 174)

Ellis summoned the backup officers, and Detectives Evans and Pearce appeared and arrested defendants Tullies and Williams. (Tr. 178) The officers found Tullies to be in possession of $1275; Williams had $360. (Tr. 252-58)

The unidentified woman was never found, but John Potts, the driver of the green Civic, was stopped nearby. (Tr. 175-76; Tr. 304, 306) The officers seized two glassine envelopes of heroin, marked "Black Jack," from Potts. (Tr. 309-11) Detective Docke reported the results of the stop to Ellis, and then he brought Potts back to the location of the drug sale. (Tr. 176-77; Tr. 311)

Ellis directed Detectives Ryals and Docke to search the Lumina. (Tr. 178-79)

> Together they searched the Lumina and the surrounding area. (Tr. 235) From under the rear bumper of the car, Ryals personally recovered "jugs" (small plastic containers) of crack cocaine and a loaded handgun with

4

> ammunition. (Tr. 236-43, 317-18) Detective
> Docke recovered from under the bumper a bag
> containing glassine envelopes of heroin,
> rubber-banded in bundles of ten, and stamped
> with the brand name "Black Jack." (Tr. 234-
> 47, 313-16) The brand-stamp "Black Jack"
> matched the stamp on the two envelopes seized
> from Potts. (Tr. 259-60) Docke also recovered
> from under the bumper two additional loaded
> handguns. (Tr. 247-52, 316-17)

(Motion opinion p. 3)

FBI Agent John Havens, Jr., testified as an expert in "methods used by drug dealers to conduct street-level drug business to include the distribution, packaging, pricing, and storage of the drugs, and also the use of firearms in furtherance thereof." (Tr. 382) He told the jury that everything that the law enforcement agents testified to comported with normal drug transactions.

Several witnesses testified for the defense. Leanna Travers, defendant Tullies's daughter, testified that on the day in question she and her friend, Stephanie Davis, drove to Weequahic Avenue to meet Tullies so that he could give her money to buy work shoes. (Tr. 44-45, 449) Leanna Travers was parked and still in her car when she saw her father pull up in a car, get out, and go over to another car to speak with a couple of women who were inside; he then walked over to Travers's car. At that moment the police arrived and blocked everyone in. (Tr. 445) Her father Tullies was handcuffed and arrested. (Tr. 446)

Stephanie Davis testified consistent with the testimony of her friend Leanna Travers. She too noted that very soon after Tullies arrived at the scene the police swarmed in and arrested him. (Tr. 437-39) On cross-examination Davis agreed that they had gone to Weequahic Avenue to see Tullies because that is where he usually hangs out. (Tr. 442)

The drug buyer John Potts, who was arrested along with Tullies and Williams, admitted that he went to Weequahic Avenue on October 4, 2017, to buy drugs. (Tr. 451) He testified that the people who sold the drugs to him were not Tullies and Williams, but rather they were "younger kids," whom he described as skinny black males between the ages of 18 and 20 years old. (Tr. 452-53)

Dina Blackwell, who had known defendant Tullies for over 20 years and is engaged to him, testified that the $1275 found in Tullies's possession at the time of his arrest was intended for a rental deposit on an apartment in Irvington. She first testified that although she had seen Potts in municipal court related to the charges in this matter, she did not have a conversation with him. (Tr. 484-87) However, during cross-examination it was revealed that Tullies urged Blackwell to contact the witness Potts online, which she did. He told her to attend Potts's court appearances and speak to Potts about the case, to "write up what John Potts should say," and to get a photo of Potts's identification. (Tr. 492-93) As the trial court has noted, "Having first testified that 'I never

6

spoke to Mr. Potts' (Tr. 493), Dina Blackwell then admitted that, at the 'first [court appearance] when they all got arrested,' she 'pulled [Potts] aside,' that she 'spoke to him outside,' and that he gave his contact information to her daughter, Amaya Smith. (Tr. 493-94)" (Motion opinion p. 6, n. 5)

Ultimately, the jury convicted both defendants of all charges.

## I. <u>STANDARD OF REVIEW</u>

Jesse Tullies is a federal prisoner in custody. As such, he may collaterally attack his sentence or conviction by moving the district court "to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255(a). To obtain relief, a petitioner must prove his or her sentence or conviction was "imposed in violation of the Constitution or laws of the United States," that the district court "was without jurisdiction to impose such sentence," that the sentence exceeds "the maximum authorized by law," or that the sentence or conviction is "otherwise subject to collateral attack." *Id.* A petitioner must prove the asserted grounds for relief by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958). Because a § 2255 motion "is ordinarily presented to the judge who presided at the original conviction and sentencing[,] . . . the judge's recollection of the events at issue" may inform the resolution of the motion. *Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977).

Section 2255 permits a federal prisoner to collaterally attack his or her conviction and/or sentence, but the grounds for such a motion are narrow. *See* 28 U.S.C. § 2255; *see also Wall v. Kholi*, 562 U.S. 545, 551-52 (2011) ("By definition . . . [a] 'collateral attack' is '[a]n attack on a judgment in a proceeding other than a direct appeal.'" (second alteration in original) (quoting Black's Law Dictionary 298 (9th ed. 2009))). A § 2255 motion does not function as a second appeal, *see United States v. Frady*, 456 U.S. 152, 165 (1982), and thus it does not ordinarily allow for re-review of issues raised on direct appeal. *See*, *e.g.*, *United States v. Travillion*, 759 F.3d 281, 288 (3d Cir. 2014); *United States v. Orejuela*, 639 F.2d 1055, 1057 (3d Cir. 1981); *see also Kaufman v. United States*, 394 U.S. 217, 227 n.8 (1969) ("Where a trial or appellate court has determined the federal prisoner's claim, discretion may in a proper case be exercised against the grant of a § 2255 hearing"). At the same time, many claims not raised on direct appeal cannot ordinarily be reviewed under § 2255. *See*, *e.g.*, *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Travillion*, 759 F.3d at 288 n.11; United States v. *DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993).

With limited exceptions, a petitioner advancing new claims asserted for the first time in a § 2255 motion "must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. at 166. The "high hurdle" applies

8

because, once a petitioner's opportunity to pursue a direct appeal has been waived or exhausted, there is "a final judgment [that] commands respect." *Id.* at 165-66.

However, those restrictions which limit the issues that may be raised in a petition pursuant to § 2255 do not apply to claims of ineffective assistance of counsel. Precedent has long recognized that "[a] § 2255 motion is a proper and indeed the preferred vehicle for a federal prisoner to allege ineffective assistance of counsel." *United States v. Nahodil*, 36 F.3d 323, 326 (3d Cir. 1994) (citations omitted); *see also Massaro*, 538 U.S. at 504 (permitting the raising of ineffective assistance of counsel claims on collateral review even when they could have been raised on direct review but were not); *DeRewal*, 10 F.3d at 105 (holding that a § 2255 petitioner is "not required to show 'cause and prejudice' with respect to his failure to raise his ineffective assistance of counsel claim on direct appeal," and suggesting that a § 2255 motion is ordinarily the proper vehicle for an ineffective-assistance claim).

To obtain relief based on an allegation of ineffective assistance of counsel, a petitioner must establish both: (1) that counsel's performance was so deficient that it fell below an objective standard of reasonableness; and (2) that counsel's inadequate performance resulted in prejudice to the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Satisfying

9

the **first** prong of *Strickland* requires a showing that counsel "made errors so serious that [they were] not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id.* at 687. The **second** prong of *Strickland* requires a petitioner to "affirmatively prove prejudice," which requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

## II. LEGAL ARGUMENT

### PETITIONER TULLIES WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN THIS CASE.

As explained above, under 28 U.S.C. § 2255, an individual in federal custody who seeks to be released upon "the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." A defendant is entitled to assistance of counsel whose performance does not fall below a minimum level of effectiveness. Assistance of counsel is ineffective if: (1) counsel fails to exercise the customary skill and diligence that a reasonably competent attorney would have employed under the same set of circumstances; and (2) the

ineffectiveness prejudiced the defendant. *Strickland v. Washington*, 466 U.S. at 687. Mr. Tullies files this petition under 28 U.S.C. § 2255, asserting multiple grounds that defense trial counsel was ineffective.

### Ground 1: Defense Counsel Should Not Have Called Dina Blackwell As A Witness Because Her Testimony Was Devastating To Tullies's Defense.

The government's case in this matter revolved around the testimony of the law enforcement officers involved in the surveillance and subsequent arrests of the defendants. The Third Circuit very briefly summarized the government's case: "Detective Yusef Ellis and his colleagues at the Essex County Sherriff's Office arrested Defendants after observing them sell heroin in Newark, New Jersey, to John Potts and an unidentified woman. On arrest, law enforcement searched Tullies and Williams' car[3] and found significant amounts of crack cocaine and heroin along with three loaded 9-millimeter handguns." *United States v. Tullies*, 2022 U.S.App.LEXIS 3655, at 1-2 (3d Cir. 2022).

The defense called into question the veracity of law-enforcement witnesses. Leanna Travers (Tullies's daughter) and Stephanie Davis (Travers's friend) both testified that they were on the scene waiting to meet with Tullies, but as soon as he pulled up in a car, he was swarmed by law enforcement and arrested. (Tr.

---

[3] The Chevy Lumina which was searched did not belong to either Jesse Tullies or Eugene Williams.

435-39; Tr. 442-46) Since Tullies was arrested as soon as he arrived at the scene, he could not have been selling drugs there.

Most importantly, the drug buyer John Potts testified that the people who sold him the drugs (which matched those drugs found in the stash of drugs contained under the bumper of the Lumina) were **not** Jesse Tullies and/or Eugene Williams. Rather, the sellers of the drugs that Potts bought were "younger kids," who were skinny, approximately six feet tall and between 18 and 20 years old. (Tr. 452-53)

On cross-examination, the government repeatedly asked about any contact that Potts had with the defendants and their families, most notably Tullies's fiancé, Dina Blackwell. Initially, Potts testified that he had not spoken with any of Tullies's family members or friends. (Tr. 457) But later he noted that he had met Dina Blackwell one time at the courthouse when he was answering for the drug-possession charge against him. (Tr. 470) The cross-examination continued:

> Q. Now, you said that she showed up at your court date. How did she know to show up at your court date?
>
> A. I have no idea.
>
> Q. And she actually – she told you that she tried to contact you via Facebook; isn't that right?
>
> A. Not that I remember.

> Q. But she — so she just showed up on your court date?
>
> A. I guess.
>
> Q. She showed up at your court appearance more than once, right?
>
> A. No.
>
> Q. Just once?
>
> A. Yeah.
>
> Q. Was she by herself?
>
> A. I believe so.

(Tr. 472) Potts repeatedly stated that he did not "remember the conversation quite well." (Tr. 473) He did not think that he gave her his phone number. (Tr. 474) When the U. S. Attorney said: "You didn't tell anyone on the planet that these defendants didn't sell you the drugs until after you spoke to Mr. Tullies' friend; is that right?" Potts answered, "Yeah." (Tr. 474)

Counsel for Tullies then asked Potts whether a defense investigator was also there with Ms. Blackwell. Potts responded, "Oh, yes, that was the second time. The second time that I — that was at the — the court date where I got the community service." (Tr. 477-78) That examination continued:

> Q. And my investigator spoke with you and your lawyer with regard to your testimony here today, correct?
>
> A. Correct.

Q. Dina Blackwell wasn't present for that discussion, was she?

A. No. It was just the investigators and my lawyer and me.

. . .

Q. Did she talk to you about the case at all?

A. The investigators talked to me about the case.

Q. Are you absolutely sure that my client did not sell you drugs on October 4?

. . .

A. 100 percent sure.

(Tr. 478-79)

By the end of Potts's testimony the fact remained -- the man who bought the drugs in question did not waiver in his testimony that Tullies and Williams did not sell him those drugs. The trial testimony should have ended there. The jury should have decided the case based on all of the evidence presented up to that point. But instead, James R. Murphy, Esq., provided ineffective assistance of counsel to defendant Tullies by calling Dina Blackwell to the stand.

Dina Blackwell testified that she had known Jesse Tullies for over 22 years and that he is her fiancé. (Tr. 485) Blackwell testified in order to explain why Tullies was in possession of $1,275 when he was arrested: "I called him to come pick the money

up because we was putting a deposit down on a house in Irvington on Grant Place." (Tr. 486)

Blackwell also explained why she went to Newark Municipal Court on the day that she saw John Potts. "I received a summons in the mail with his name on it.  I wanted to make sure they know he's incarcerated so he wouldn't receive a bench warrant." (Tr. 486) She did not see Potts that day in municipal court. However, she went there a second time with an investigator for defense counsel and she saw Potts at that time. Just as Potts had testified earlier, Blackwell said that she did not have a conversation with Potts. (Tr. 487)

At sidebar, the U.S. Attorney advised the court that he intended to cross-examine the witness regarding the many jail phone calls she had with defendant Tullies. (Tr. 488-89) Defense counsel noted that Tullies "calls her probably 20 times a day, so probably about 700 calls." (Tr. 489) When asked by the U.S. Attorney on cross-examination if she has had more than 1,000 phone conversations with Tullies since his arrest, Blackwell responded, "Probably so. He calls." (Tr. 491)

Blackwell went on to say that she also had a few phone conversations with co-defendant Williams, and she "helped arrange a conversation between the two of them." (Tr. 491) Her cross-examination continued:

Q. In those perhaps thousands of conversations that you've had with Mr. Tullies, he asked you to find John Potts, didn't he?

A. Yes.

Q. He asked you to search for him online?

A. Yes.

Q. He asked you to send John Potts a Facebook message?

A. Yes.

Q. And you did send him a Facebook message?

A. I believe I did.

Q. He asked you to go to John Potts' court appearances.

A. He said he – that he tell him come to court, but I received a letter from the court saying he was going to be in court.

Q. I understand that you received a letter, ma'am, but I'm asking you, Mr. Tullies also asked you to go to John Potts' court appearance; isn't that right?

A. Yes.

Q. He asked you to go to the court appearances and speak to him about this case, right?

A. Yes.

Q. And he asked you to do all of these things multiple times?

A. Yes.

Q. On his behalf?

A. Yes.

16

Q. And he asked you to write up what John Potts should say, right?

A. Yes.

Q. He asked you to take a photo, to get John Potts' identification, and take a photo of it, didn't he?

A. Yes.

Q. And so you did, in fact, go to the court appearances multiple times and speak to Mr. Potts?

A. I never spoke to Mr. Potts.

Q. You never spoke to Mr. Potts?

A. No.

Q. You did pull him aside, though, right?

A. When we first went to court the first time, when he was on [sic] the Municipal Court, not the second one — the first one when they all got arrested, I did go to court then.

Q. And you did pull him aside?

A. Yes.

Q. And he gave you his phone number?

A. No, he didn't give me his phone number that time.

Q. Did he give you contact information?

A. He — I spoke to him outside. He actually gave it to my daughter. He didn't give it to me.

Q. But — so — but when you pulled him aside, you spoke to him, it was just the two of you at that moment?

      A. Me, myself and my daughter.

(Tr. 492-94)

A review of Dina Blackwell's testimony reveals only a single possible benefit to the defendant – she explained that she had given him the $1,275 that he had in his possession; ergo, that money was not the proceeds of drug sales. However, even that part of Blackwell's testimony was of little help to defendant Tullies. Given her long relationship and engagement to Tullies, her credibility was suspect. The U.S. Attorney certainly pointed that out to the jury via his cross-examination about (1) how much she cared for Tullies; (2) her love for him; (3) her desire that he not be incarcerated; and (4) the leading question, "[a]nd fair to say you'd do anything you could to help keep him out of jail," to which she responded "Yes." (Tr. 490)

Further, her testimony did not match up with the testimony of his daughter Leanna Travers. Blackwell said that she gave Tullies exactly $1,275 which he was to use as a deposit on a rental property. But Travers said that she went to the scene of the arrest to meet Tullies so that he could give her money for work shoes. As the U.S. Attorney emphasized in his summation, the jury was left to wonder where the extra money for the shoes would have come from

if all of the money that Blackwell said that she gave to Tullies was supposed to go towards the rental deposit.[4]

Defense counsel's calling of Dina Blackwell to the witness stand provided at most some negligible benefit to Tullies regarding the money that he had in his possession. But per his comment at sidebar, it is clear that defense counsel was aware that while Tullies was in jail on the instant charges, Blackwell had spoken to him through recorded jail calls "probably 20 times a day." (Tr. 489) Hearing the content of those conversations, any competent defense attorney would know that the overall impact of Blackwell's testimony would be devastating to the defense. The cross-examination regarding those recorded conversations could only lead the jury to conclude that Tullies was trying to manipulate Potts to provide untruthful testimony to aid the defense. If, on the other hand, counsel knew about those phone calls but failed to listen to them, his ineffectiveness would be even more evident.[5]

---

[4] The U.S. Attorney told the jury: "When you marry up [Blackwell's] testimony with Mr. Tullies' daughter, it simply doesn't ring true. It doesn't pass the smell test.
"She's [sic] bringing – the daughter said $75 for sneakers. You remember that? Miss Blackwell said it was $1,275 for rent, together, that's more than the 1,275 he had. He didn't have enough money to do both, the sneakers and the rent. Doesn't add up." (Tr. 518-19)

[5] According to the affidavit Dina Blackwell signed in connection with this motion, before testifying she "was never prepared by Mr. Murphy. I was never asked to meet him at his office nor did he ever come to my home or seek to meet me at my location." The only time Blackwell spoke with Murphy was at the courthouse, just prior to taking the witness stand. She was "never advised … as to what

It is submitted that in this case, defense counsel Murphy failed to exercise the customary skill and diligence that a reasonably competent attorney would have employed under the same set of circumstances. *Strickland v. Washington*, 466 U.S. at 687 (Prong One). No competent defense attorney would have called Dina Blackwell to the witness stand knowing the content of those phone calls.

Turning to the impact of trial counsel's ineffectiveness, it is recognized that to be successful on this application defendant Tullies must show that the ineffectiveness of his attorney prejudiced him. *Strickland v. Washington*, 466 U.S. at 687 (Prong Two). A review of the transcripts in this case up until the testimony of the last witness (Blackwell) shows a viable defense; adding that last witness's testimony smothered that defense. This Court has even noted the impact of Blackwell's testimony: "It was fair to point out on cross-examination that Potts's exculpatory testimony occurred after he learned that the defendants were accused of being armed drug dealers, and after he had been approached, inferably on Tullies's behalf, by Dina Blackwell." (Motion opinion p. 17) (emphasis added)

---

cross-examination would occur nor that I would be questioned about prior conversations with Mr. Tullies." "In summary, Mr. Murphy called me as a defense witness without any preparation." (Defendant Motion Appendix 1)

In its opinion on the defendant's motion for a judgment of acquittal or in the alternative for a new trial, this Court discussed the strength of the evidence against the defendants. The Court spoke of Blackwell's testimony as lending support to the government's case rather than the defendants:

> Dina Blackwell, who identified Tullies as her fiancé, testified in a manner that would have permitted the jury to infer that she had put tacit pressure on Potts. She admitted to speaking to both defendants since their arrest and arranging conference calls between them. She admitted on cross-examination that Tullies asked her to find Potts and contact him online, and that he directed her "multiple times" to attend Potts's court appearances and speak to him about the case. She admitted that Tullies directed her to "write up what John Potts should say," and directed her to take a photo of John Potts's identification. Still, she said initially, she "never spoke to Mr. Potts." She also testified that she did not see Potts at an initial municipal court appearance, but only at a second one, in the company of an investigator. (Tr. 486-87) Confusingly, she backtracked, admitting that at his first court appearance, she "pulled Potts aside" and spoke to him outside of court in the company of her daughter, to whom he gave his contact information. (Tr. 493-94)
> The evidence of guilt, then, was quite strong, and the testimony for the defense was readily discredited.

(Motion opinion p. 33-34) Regarding Blackwell's admissions on cross-examination, this Court noted that "[s]he had little choice. The government had in its possession tape recordings of the relevant telephone calls. . . . Although the government had proffered the calls in evidence, it withdrew that request after

21

Dina Blackwell admitted the essentials on cross-examination. (Tr. 496)" (Motion opinion p. 33, n. 20)

Defendant Tullies submits that per the requirements of *Strickland v. Washington* he has shown that he was deprived of his right to competent counsel. His attorney (1) failed to exercise the customary skill and diligence that a reasonably competent attorney would have employed under the same set of circumstances; and (2) the ineffectiveness prejudiced him. He respectfully requests that the Court grant his motion pursuant to 28 U.S.C. § 2255(a).

**Ground 2: If The Calling Of Dina Blackwell As A Witness Did Not Render Counsel Ineffective, His Failure To Salvage Her Credibility By Calling The Investigator That He Claimed Was With Her Resulted In Ineffective Assistance Of Counsel.**

As the previous subsection argues, the calling of Dina Blackwell to the witness stand doomed the defense. Should this Court find that calling Dina Blackwell as a defense witness did not render counsel constitutionally ineffective, it is submitted that the defense attorney's failure to bolster her credibility by calling the much-discussed defense investigator that counsel claimed was with her when she saw the witness John Potts at municipal court, surely added to the problematic actions of counsel and resulted in ineffective assistance of counsel.

As this Court has noted, Dina Blackwell "testified in a manner that would have permitted the jury to infer that she had put tacit

22

pressure on Potts." (Motion opinion p. 33) The U.S. Attorneys forcefully made that argument through the examination of Blackwell and summation.

In an effort to counteract the government's suggestion that Blackwell spoke with Potts and pressured him in some way, defense counsel brought out on the redirect of Potts that defense counsel's investigator was there when Potts saw Blackwell at municipal court, and Potts agreed that the conversation that took place was between him, his attorney and the investigator.[6] But even after Blackwell's disastrous testimony, counsel for defendant Tullies never called his investigator to the stand to verify that: (1) he, the investigator, was in fact there in court; (2) he spoke with Potts and Potts's attorney about the upcoming matter at bar; and (3) of critical importance, Blackwell did not put any pressure on Potts.

In *Carpenter v. Vaughn*, 888 F. Supp. 635, 654 (M.D.Pa. 1994), the district court considered the *habeas corpus* petition of a state inmate in Pennsylvania. Among other things, the petitioner had contended "that trial counsel was ineffective for failing to call to testify at trial an eyewitness whose testimony would have corroborated petitioner's version of events." In that case, a woman named Emmil testified that she saw the petitioner stab the victim

---

[6] The redirect examination regarding the presence of defense counsel's investigator at Potts's municipal court appearance is quoted above in subsection A, and can be found at Tr. 478-79.

to death; the petitioner testified that he saw Emmil stab the victim to death. The court noted: "It cannot reasonably be disputed that the jury's verdict in petitioner's case was contingent upon witness credibility, in particular." *Id.* at 654-55. The court noted that Emmil did not have a police record, and therefore "[h]er testimony had a high degree of credibility." *Id.* at 655. On the other hand, petitioner had a record that included a prior murder. "Petitioner's testimony, therefore, had a considerably lower degree of credibility than that of Emmil. <u>In order for the jury to believe petitioner's version of events, corroborating testimony was crucial. No such testimony was offered, although it apparently existed</u>." *Id.* (emphasis added). The district court noted that "[i]f this witness had testified as proffered by petitioner, there is no question that the testimony would have strongly bolstered petitioner's version of events." 888 F.Supp. at 655.

Likewise, testimony by Murphy's investigator would have surely helped to bolster Blackwell's credibility and blunt the government's attempt to convince the jury that Potts's exculpatory testimony was false, and was motivated by pressure from Blackwell (and inferentially by her fiancé Jesse Tullies). It was inexcusable to put Blackwell on the witness stand and then, after withering cross-examination on the issue of alleged undue influence she put on Potts at the behest of Tullies, fail to call the investigator who was there at the municipal courthouse and who could have

24

testified that Blackwell was there but she did not participate in the conversation with the key defense witness.

Defendant Tullies submits that per the requirements of *Strickland v. Washington* he has shown that he was deprived of his right to competent counsel. His attorney (1) failed to exercise the customary skill and diligence that a reasonably competent attorney would have employed under the same set of circumstances when he failed to call his investigator as a witness; and (2) the ineffectiveness prejudiced him, as noted in this Court's synopsis in the motion opinion of how damaging Blackwell's testimony was to the defense. Jesse Tullies respectfully requests that the Court grant his motion pursuant to 28 U.S.C. § 2255(a).

> **Ground 3: The Testimony Of FBI Agent John Havens, Jr., Appearing As An Expert For The Government, Should Have Been Objected To And Deemed Inadmissible Because It Directly Commented On The Mens Rea Of The Defendants In Violation Of F.R.E. 704(b).**

As noted earlier, FBI Agent John Havens, Jr., testified as an expert in "methods used by drug dealers to conduct street-level drug business to include the distribution, packaging, pricing, and storage of the drugs, and also the use of firearms in furtherance thereof." (Tr. 382) This Court described his testimony as follows:

> Havens testified that street-level drug dealers will typically set up a territory, often on a quiet block, will protect that territory, and will generally permit only one brand to be sold within that territory. Transactions, he explained, are generally done

25

in cash, and often in small bills, which may be traded in for larger bills at local businesses such as bodegas. The packaging of the drugs and the currency seized in this case, he opined, were typical. (Tr. 374-398) Havens testified that street-level dealers do not want to be caught in physical possession of drugs, so they typically stash them at a location which they can monitor. They then retrieve amounts as necessary for sales. To maintain deniability, the location would typically not be owned by or traceable to the dealer. The facts of this case, he opined, fit that pattern. (Tr. 398-401)

(Motion opinion p. 4)

Havens also testified that drug dealers use guns to protect their product from robbery, to protect their territory from other drug dealers and to make sure that they get paid by the buyers. According to Havens, guns are sometimes kept with the stash of drugs so that the dealer can avoid being caught in actual possession of the guns.[7] Havens again testified that the typical pattern of gun possession by drug dealers fit the facts of this case. (Tr. 401-04)

It is submitted that counsel for defendant Tullies provided constitutionally ineffective assistance to his client by failing to object to the expert law-enforcement testimony outlined above. By expressing his opinion that the facts of this very case fit the

---

[7] Neither defense attorney cross-examined Agent Havens about the incongruity in his testimony regarding the need of drug dealers to possess guns in order to protect their territory, yet keeping the guns with the drug stash and therefore out of reach if needed.

pattern of drug dealing and illegal gun possession, the expert improperly referred to the defendants's intent to sell illegal drugs. The mental state, or *mens rea*, of Jesse Tullies was an element of the charged offenses and the determination of that element should have been left to the jury, unburdened by the very convincing but inappropriate testimony of the FBI expert.

According to *Fed. R. Evid.* 702, a witness may provide an expert opinion if he or she is "qualified as an expert by knowledge, skill, experience, training, or education." The United States Supreme Court has explained that "[w]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in knowledge and experience of [the relevant] discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). Defendant concedes that the operations of drug dealers has been deemed a proper field of expertise. "[E]xperienced narcotics agents may testify about the significance of certain conduct or methods of operation to the drug distribution business, as such testimony is often helpful in assisting the trier of fact understand the evidence." *United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997). However, under *Fed. R. Evid.* 704(b) no expert witness "testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or

did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."

The Third Circuit has noted that "[e]xpert testimony concerning the modus operandi of individuals involved in drug trafficking does not violate *Rule* 704(b). For example, a Government expert may testify about the meaning of narcotics code words…. A Government expert may also testify about the quantity, purity, usual dosage units, and street value of narcotics…. And, an expert may testify about the various counter-surveillance techniques used by drug dealers to avoid detection by the police." *State v. Watson*, 260 F.3d 301, 308 (3d. Cir. 2001) (citations omitted)

On the other hand, *Watson* made clear that "[t]here is, however, 'a [fine] line that expert witnesses may not cross.' *United States v. Mitchell*, 302 U.S. App 153, 996 F.2d 419, 422 (D.C. Cir. 1993)." *Watson*, 260 F.3d at 308. The court explained the scope of the Rule: "*Rule 704(b)* may be violated when the prosecutor's question is plainly designed to elicit the expert's testimony about the mental state of the defendant, or when the expert triggers the application of *Rule 704(b)* by directly referring to the defendant's intent, mental state, or mens rea." *Watson*, 260 F.3d at 309 (citations omitted). Further, the Third Circuit said that "*Rule 704* prohibits testimony from which it necessarily follows, if the testimony is credited, that the

28